UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-20071-CR-JORDAN/MCALILEY

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MICHAEL LAUER, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION
## ON DEFENSE MOTIONS

The Defendant, Michael Lauer, has filed two motions that have been referred[1] to me for report and recommendation: (1) Motion for Return of Property (Computer, Blackberry, and iPhone Tray) [DE 392][2], and (2) Motion to Suppress and for Additional Remedy [DE 422].[3] I held an evidentiary hearing on both motions on January 20 and 22, 2010.[4] The defense called three witnesses to testify: Arthur Hill and Jeff Mendez, both employees of Delta airlines who worked at the John F. Kennedy International Airport (JFK) on the day of Lauer's arrest, and Federal Bureau of Investigation (FBI) Special Agent Chanin Waterman. In addition, I have reviewed the reports, emails and affidavits attached to the

---

[1] See Orders of Referral. [DE 395, 426].

[2] The motion is fully briefed. [DE 401, 410, 413, 416].

[3] This motion is also fully briefed. [DE 441, 444].

[4] The transcripts of those hearings have been filed with the Court. [DE 468, 473].

various memoranda filed by the parties. For the reasons that follow, I recommend that the Motion for Return of Property be denied, and the Motion to Suppress and for Additional Remedy be granted in part.

1.  **Factual findings**

On February 16, 2008, Lauer arrived on an international flight at JFK, and was arrested by agents of the FBI, on an arrest warrant and Indictment issued in this District. Lauer arrived at JFK with baggage, that included a Hewlett-Packard laptop computer and a BlackBerry telephone. Upon his arrival and before his arrest, Lauer and his luggage were subject to a routine inspection by officers of the United States Immigration and Customs Enforcement (ICE). Knowing Lauer was to be arrested, the ICE officers told Lauer that he could not take his luggage with him; they arranged for Delta Airlines to take custody of his possessions, including the laptop and BlackBerry, and to have them returned to Lauer's wife.

When the agents transported Lauer from the airport to the FBI for processing, they allowed him to take with him his cellular telephone - an Apple iPhone. When Lauer was later brought to the federal detention center, the arresting agent took custody of the iPhone. A few days later, Miami FBI co-case agent Chanin Waterman traveled to New York to attend Lauer's initial appearance (held on February 19, 2008). At that time she took custody of the iPhone, and brought it with her back to Miami.

   a.  **The missing laptop and BlackBerry**

2

Jeff Mendez, a Delta lead customer service agent, took possession of Lauer's luggage and wallet, and placed them in a locked office shared by him and several other Delta lead agents and their managers. He was also given contact information for Lauer's then-wife, Heidi Lauer, who he called and asked to pick up her husband's bags. The next day Mendez prepared a written inventory of the contents of the bags; that inventory documented the presence of the laptop computer and BlackBerry telephone. [Gov. Ex. 1]. Some days later, Heidi Lauer retrieved the bags from Delta. After she brought the bags home, she looked through them and saw that the laptop and BlackBerry were not there. All of Lauer's other possessions, including cash, credit cards, a check for a substantial amount, jewelry and watches, evidently were returned with the luggage. Mrs. Lauer reported the missing electronics to Delta, and spoke with Mendez's supervisor, Arthur Hill, about her claim but the missing items were never found.

Lauer brought the Motion for Return of Property on the suspicion that the FBI, or other government agents, took the laptop and BlackBerry at JFK. Lauer argued that the two items missing from his luggage were the only two that might have some evidentiary value to the government, and that this suggested the government was responsible for their disappearance.[5] Lauer points out that if someone outside of the government, such as a Delta employee, were to have taken the electronics from the stored bags, one would expect

---

[5] According to Lauer, the laptop contained work product from his *pro se* representation of himself in a parallel SEC civil enforcement action, and other civil lawsuits. [DE 392, p. 7].

3

that other valuables would also be missing, which they were not. Lauer also argued that the manner in which Delta dealt with his bags - inventorying the contents in the absence of a company policy that clearly required an inventory, and then giving the bags to Mrs. Lauer without confirming with her that all items on the inventory were in fact being returned - raised more questions.

In support of these suspicions, Lauer filed a declaration of his former wife, that describes the events surrounding the return of her husband's luggage, including a telephone conversation with Arthur Hill, in which he reportedly said the following about the laptop:

> He stated that it was in his locked office and that the FBI had been in his office with the luggage, including the laptop. When I said that the FBI agents must have taken the computer, he said something like, "Draw your own conclusions." It was clear to me based on his words and tone that we were on the same page that the FBI had taken the laptop.

[DE 413-1, ¶ 10]. Heidi Lauer did not testify at the evidentiary hearing.

Arthur Hill did testify and he denied making this statement to Mrs. Lauer. I found both Mr. Hill, and Mr. Mendez, very credible. Both were consistent and clear in their testimony that once they received Lauer's luggage, it remained in their secure custody. After hearing their testimony, I am satisfied that there was nothing about their handling of the luggage that suggests any government wrong-doing. They also testified that, other than the initial communications with ICE officials, no government representative, and certainly no one from the FBI, instructed them to take any action regarding Lauer's luggage. They believed that the laptop and BlackBerry were in Lauer's bags when his wife retrieved them.

4

Both also testified that they had no reason to think the government removed the laptop and BlackBerry from the luggage once it was in Delta's custody. Both testified consistently that the luggage was kept in a locked office, that could be accessed only by a limited number of Delta employees. I credit the testimony of the two Delta employees, and find they rebut the suspicions raised by Lauer, and the declaration testimony of Mrs. Lauer. I specifically find there is no credible evidence that a government agent took, or has possession of, Lauer's laptop computer and BlackBerry.

### b. The unlawfully searched iPhone

Agent Waterman testified about her custody and search of the iPhone. When she returned to Miami with the cell phone, Agent Waterman locked it inside her desk at the FBI. She had not been given a charger for the telephone, and it was not charged while in her custody. Agent Waterman was unfamiliar with iPhones, apparently having never before used one. The screen on the telephone was dark, and she assumed it was off.

On or about March 6, 2008 (some 19 days after Lauer's arrest), Agent Waterman removed from her desk drawer the envelope that contained the iPhone, and placed it on top of her desk while she sat there and worked. At some point the telephone rang, Agent Waterman removed it from the envelope and, although she did not know how to operate the phone, she touched the screen in an effort to stop the ringing. The phone did stop ringing, and in the course of her touching the screen, a directory for the telephone's address book appeared.

According to Agent Waterman, she inadvertently opened the address book. Agent Waterman then scrolled through each entry in the address book, and typed a document on her computer that listed 138 names, and corresponding telephone numbers, email and street addresses and business names, that appeared on the screen. Once she finished documenting all the information in the iPhone's address book, Agent Waterman touched the calendar icon, and opened the January calendar where she saw one entry, and also wrote down this information. Agent Waterman spent about 25 minutes retrieving, and typing, this information. [DE 468, p. 83]. When she finished, another agent showed Agent Waterman how to turn off the phone, which she did.[6] Agent Waterman printed her typed list, but apparently did not save the document in her computer.[7]

Possibly that day, and certainly within a day or two, Agent Waterman told Assistant United States Attorney Harry Schimkat that she had collected this information from Lauer's telephone. Mr. Schimakt told the Court at the evidentiary hearing that he instructed Agent Waterman to "put it aside and not to do anything with it." [DE 468, p. 122]. It wasn't until sometime in late 2009 (around the time of the filing of these motions) that Agent Waterman gave AUSA Schimkat a copy of the typed list she had prepared. At the evidentiary hearing AUSA Schimkat and co-counsel Jack Patrick, a trial attorney with

---

[6] Agent Waterman's testimony about the circumstances of her opening the retrieving information from the telephone are found at DE 468, pp. 79-84, 110-111.

[7] That list was introduced at the evidentiary hearing as Government Exhibit 2.

the Department of Justice, both advised the Court that they made no use of the information on that list. [DE 468, p. 123].

At about the same time that she searched the iPhone, Agent Waterman spoke with Craig Rasile, Esq., counsel for the Receiver in the parallel SEC civil enforcement action then pending before a different division of this Court, and told him about the information she had retrieved, and faxed him the typed list she prepared. There is no evidence before this Court that Mr. Rasile, or anyone else working on his behalf, used the information seized by Agent Waterman in the civil SEC action, or otherwise.[8]

On April 23, 2008, Lauer's previous counsel filed a motion for the return of the iPhone. [DE 119]. Shortly after that, on May 7, 2008, Agent Waterman applied for a warrant to search the iPhone and the Honorable Robert L. Dube issued the warrant.[9] The same day the government also filed its response to Lauer's motion for the return of the

---

[8] Counsel for Lauer and the government both spoke with Mr. Rasile by telephone, after Agent Waterman testified, and reported the substance of their conversations to the Court. [*See* DE 473, pp. 17-27]. Rasile said that he received Agent Waterman's fax on March 5, 2008, and distributed it to persons at his law firm who were working with him on the matter, but that no one at the firm made any use of the information. Rasile received a call from Agent Waterman, sometime around March 14, 2008, advising him that there may be "an issue" with respect to her search of the iPhone, and instructing him to not do anything with the information she had provided. [*Id.* at 20]. Apparently, before he received that call, Rasile gave the list to an investigator, Chic Sabinson, and an investigative firm, Veritas, that were assisting the Receiver and others in parallel civil proceedings. Rasile was unable to say what these investigators did, or did not do, with the information. Although Lauer's counsel said that he intended to inquire of the investigators about their possible derivative use of the information seized from the iPhone, he told the Court that he saw no need to postpone a ruling on these motions pending his further investigation. [*Id.*, p. 24].

[9] The Search Warrant and Application were filed as attachments to the Motion to Suppress. [DE 422-1].

iPhone, and disclosed the just-issued search warrant. [DE 137]. The following day, May 8, 2008, Lauer filed an emergency motion asking the Court to order that the government not search the phone. [DE 138]. On May 12, 2008, the Honorable Adalberto Jordan issued an order directing the government to not search the iPhone, until he ruled on the emergency motion. [DE 146]. A substantial delay ensued, while Lauer sought to permanently retain counsel; it wasn't until April 3, 2009, that Lauer was appointed his permanent counsel [DE 310], and the Court issued the Standing Discovery Order. [DE 313]. Once Lauer had permanent counsel, Judge Jordan ordered the government to provide Lauer with the search warrant application, so that he might seek an order quashing the warrant [DE 323], and Lauer did file such a motion. [DE 337]. On June 18, 2009, Judge Jordan found that the government unreasonably delayed its application for the search warrant, and on this ground granted Lauer's motion and directed the FBI to not search the iPhone, and to return it to Lauer. [DE 351].

Agent Waterman testified that she and Mr. Schimkat discussed the possibility of seeking a search warrant for the iPhone at some point before Lauer filed his motion for return of property, although she could not recall exactly when they spoke of this. [DE 468, p. 87]. Sometime after she collected the data from the iPhone, Agent Waterman spoke with Gaston Nieves, a forensic examiner in her office, who explained that the iPhone is "more of a computer than just a phone" [DE 468, p. 90], and that documents could be stored on the phone, similar to any other computer. Agent Waterman testified that having heard this,

she was motivated to get a search warrant to search for stored information that might support her suspicion that Lauer was violating an asset freeze order. [DE 468, p. 106-7].

The government did not disclose the full extent of the Agent Waterman's search until very recently.[10] Earlier, in her application for the search warrant, Agent Waterman made this vague acknowledgment of the search:

> On February 21, 2008, I took custody of the Apple iPhone in New York from the agents who had arrested Lauer. I transported the iPhone to the FBI's Miami Field Office. At that time the iPhone appeared to be turned off, however, I learned that it must have been in "sleep mode" because on approximately March 6, 2008, while the iPhone was in my custody at the FBI, the iPhone began ringing as if there was an in-coming call. In response to the ringing, I retrieved the iPhone from the evidence bag in which it was located and looked at the iPhone's screen to see how to shut it off. *While the iPhone was on and before it could go into "sleep mode" again, I proceeded to access and write down other information contained on the iPhone's screen.*

[DE 422-1, ¶ 28] (emphasis supplied).

It wasn't until November 12, 2009, about twenty months after Agent Waterman's warrantless search of the iPhone, that the Government turned over to Lauer the typed list of contact information she prepared. [DE 422, p. 12].

2. **Analysis**

   a. **Motion for return of property**

   Lauer moves, pursuant to Federal Rule of Criminal Procedure 41(g), for the return

---

[10] The fact that the government did more than a cursory search of the iPhone was first disclosed in the government's response to the pending motion for return of property, filed on November 10, 2009. [DE 401, p. 11, n.3]. That disclosure triggered the motion to suppress.

of his laptop computer, BlackBerry phone and iPhone tray.[11]  The Rule provides, in part:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. . . . The court must receive evidence on any factual issue necessary to decide the motion.

Fed.R.Crim.P. 41(g). In addition to my review of the various declarations filed by the parties, I granted Lauer's request (opposed by the government) to hold an evidentiary hearing, and heard from each of the witnesses Lauer wanted to call. The bottom line is that Lauer presented no evidence that the government is in possession of his laptop computer, or BlackBerry telephone. Based on the evidence before me, I find that the government does not have those items. ". . . Rule 41(g) permits only the recovery of property in the possession of the Government. Therefore, if the Government no longer possesses the property at issue, no relief is available under Rule 41(g)." *United States v. Stevens*, 500 F.3d 625, 628 (7th Cir. 2007). Accordingly, I recommend that this motion be denied.

### b.   Motion to suppress and for additional remedy

Lauer's Motion to Suppress and for Additional Remedy requires more analysis because (1) the evidentiary record and procedural history is more involved, (2) Lauer raises alternative legal arguments and (3) he seeks a wide array of remedies. In the end, however, the outcome is certain: the Court should order suppression, but deny Lauer's request for

---

[11] Although Lauer's iPhone was returned to him, for unexplained reasons a component was missing: a tray within the iPhone that holds the SIM card. In his motion Lauer asked for the return, or replacement, of this missing tray. The government could not explain why the tray was missing, but conceded its obligation to return the part to Lauer, and delivered a replacement tray to Lauer. Thus, this part of the motion is moot.

additional remedies.

This much is clear: on or about March 6, 2008, Agent Waterman conducted a warrantless search of the iPhone, she seized considerable information from that device, and did so in violation of the Fourth Amendment to the Constitution. The government concedes this and agrees to the remedy of suppression. [*See* DE 441, pp. 1, 6-7]. The government also effectively concedes that any derivative evidence should be suppressed. It insists, however, that there is none, as it never made any use of the unlawfully seized evidence [*id.*, p. 1], and the record bears this out.[12]

The government correctly points out that the available remedy for a Fourth Amendment violation is suppression of the unlawfully seized evidence, *see Weeks v. United States*, 232 U.S. 383 (1914), and *Mapp v. Ohio*, 367 U.S. 643 (1961), and having conceded suppression, the government argues that Lauer's motion is moot. The government is correct that to the extent Lauer seeks suppression as a remedy, the only thing for this Court to do is to enter an order excluding from evidence the illegally seized information, and any derivative evidence.

---

[12] Agent Waterman testified that she made no use of the illegally seized evidence in this criminal investigation and prosecution, and government counsel confirmed the same. There is no evidence that calls into question the veracity of these statements, and I specifically credit the government's evidence in this regard. Although the information was shared with the Receiver's counsel and his investigators in the parallel civil SEC enforcement action, there is no indication that the evidence was in fact used in that civil proceeding. Further, even if use was made of the unlawfully seized evidence in the civil action, Lauer has provided me with no legal authority to support the notion that this would call for a remedy, other than suppression, in this criminal case. [*See also* DE 474, defense notice that it seeks only relief in this criminal case].

Lauer, however, asks for remedies beyond suppression, raising alternative arguments meant to support those remedies. Specifically, Lauer argues that Agent Waterman's explanation about how she came to search the iPhone is not credible, that the government did not timely meet its obligation to disclose the warrantless search and, in the process, breached its disclosure obligations under *Brady*. Lauer argues that this calls for "dismissal of certain counts, the transfer of Mr. Lauer's case to New York . . . or the striking of Agent Waterman as a witness[,]" and suggests that other sanctions may be appropriate. [DE 422, p. 18]. I do not believe these arguments have merit.

### i.   The government's disclosure and *Brady* obligations

The government, in its application for a search warrant for the iPhone, did not inform the Court of its extensive warrantless search and seizure of contact and calendar information from that device. Instead it made only a vague reference to the search. Although the government tries to argue that Agent Waterman, in her application for the search warrant, fully disclosed her earlier search and seizure, this is entirely unpersuasive. The extent of Agent Waterman's disclosure was the following: "While the iPhone was on and before it could go into 'sleep mode' again, I proceeded to access and write down other information contained on the iPhone's screen." [DE 422-1, ¶ 28]. This is a far cry from revealing that Agent Waterman spent 25 minutes retrieving and recording contact information for 138 persons listed in the address book, and one calendar entry.

The government, however, had good reason to not fully disclose its unlawful search

in its warrant application: it sought to follow the prescript set out by the Supreme Court, in *Murray v. United States*, 487 U.S. 533 (1988). In that case, agents made a warrantless search of a warehouse, during which they saw bales of marijuana in plain view. The agents then applied for a search warrant, without mentioning their prior unlawful entry. The warrant presented probable cause, independent of the agents' observations during their earlier entry, and was issued. On review, the Court resorted to the independent source doctrine when considering whether the marijuana, seized pursuant to the search warrant, should be suppressed:

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Id.* at 542. By not disclosing to Magistrate Judge Dube that Agent Waterman had already discovered contact and calendar information in the iPhone, the government insured that this did not serve as a basis for Judge Dube's probable cause finding. Lauer argues however, that under *Murray*, the government had to disclose this information in its application, because Judge Dube had to determine whether Agent Waterman's decision to seek the warrant was "prompted" by what she saw during her initial search. [DE 422, p. 14].

Alternatively, Lauer argues that once he filed his motion to quash the search warrant, the government had to fully disclose the prior warrantless search, so that the

reviewing court could determine, under *Murray*, whether the earlier illegal search prompted the later search warrant application. According to Lauer, at this point in the proceedings this information was material to his guilt, and thus had to be disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. [DE 422, p. 16]. By not meeting its disclosure obligations under *Brady*, Lauer's reasoning goes, the government violated his right to due process of law, and thus must be sanctioned with one of Lauer's proposed alternative remedies. [DE 422, p. 17].

Lauer's series of arguments are entirely without merit. As an initial matter, I do not believe the government had to disclose to Judge Dube the full extent of its search of the iPhone. The government properly sought to follow *Murray*, in its search warrant application, with its vague reference to Agent Waterman's warrantless search. In this manner the government legitimately tried to walk a line between making some acknowledgment of the search, without relying upon the results of that search. I do not read *Murray* to require the judge who issues the search warrant to evaluate whether the application was prompted by an earlier unlawful search; rather I understand this to be a question for the court that later reviews a warrant upon a motion to suppress.

On that reasoning, however, I do agree with Lauer that the government should have fully disclosed its prior warrantless search when Lauer's motion to quash the warrant was before Judge Jordan. However, in this instance, the government's failure to do so does not amount to a violation of Lauer's due process rights under *Brady v. Maryland*.

14

> To establish a *Brady* violation, the defendant must show that (1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) *had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different.*

*United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002) (emphasis supplied). There is no need to consider the first three elements of a *Brady* violation, as Lauer can not establish the last element - that full disclosure of the warrantless search would have led to a different outcome - because Lauer *won* his motion to quash the search warrant. Put differently, as it turned out, Lauer did not need to argue that the earlier illegal search prompted the later search warrant (one of the tests set forth in *Murray* for suppression) because he succeeded in quashing the search warrant on other grounds. In sum, I conclude that Lauer has not established a violation of his due process rights under *Brady*, and thus this proposed justification for an "additional remedy" fails.

A question remains, however, whether the government failed to timely meet some other obligation to fully disclose Agent Waterman's unlawful search. Although the government tried to debate the point at oral argument,[13] I believe the data retrieved from the iPhone was subject to disclosure pursuant to Federal Rule of Criminal Procedure

---

[13] In its memorandum the government concedes it was delinquent in providing discovery: "The government recognizes its oversight in not including the information the case agent obtained from the iPhone in the discovery provided to the defense or by otherwise making that information available so that the defense would have had notice of the specific information obtained by the government from its limited search of the iPhone." [DE 416, p. 4].

16(a)(1)(E)(iii)[14], Local Rule 88.10(A)(5) and the Standing Discovery Order [DE 313, ¶ (A)(5).[15] The government correctly points out that in this unusual case, due to the extraordinary delay in Lauer retaining permanent counsel, the Standing Discovery Order was not issued until nearly a year after his arrest (on April 3, 2009), and thus the government's disclosure obligation under the Rules did not arise until that time. The government, however, unjustifiably waited another seven months, until November 12, 2009, to produce Agent Waterman's typed list of the data taken from Lauer's iPhone. This Court should not countenance this delay. The delay in this instance, however, does not call for the Court to sanction the government. It ultimately disclosed the information well in advance of trial, Lauer has had a full opportunity to litigate issues arising from that warrantless search, and the government will not make use of the illegally seized evidence. Thus the government's failure to meet its discovery obligations has caused Lauer no harm and that being the case, Lauer once again has not justified his call for an "additional remedy."

Last, Lauer argues that Agent Waterman's explanation about how she came to search the iPhone, is not credible. I did not find Agent Waterman fully believable at several points in her testimony. For example, her testimony that the iPhone rang after

---

[14] That Rule requires government disclosure of "data . . . obtained from . . . the defendant." Fed. R. Crim. P. 16(a)(1)(E)(iii).

[15] The latter two track the corresponding language in Rule 16(a)(1)(E)(iii).

nineteen days (between Lauer's arrival at JFK on February 16th and the phone's ringing on or about March 6th) without being charged, defies common experience with cell phones, and is contrary to Apple's product information. [*See* DE 422, p. 3, ¶ 10]. I am also skeptical of Agent Waterman's explanation that she fumbled with the phone as it rang, and inadvertently opened up the address book. My doubts about her credibility however, do not come close to calling for a sanction, such as Lauer's request that the Court strike Agent Waterman as a witness. The question of her credibility is best left for a jury when she will be subject to questioning at trial.

In sum, I believe the only sanction supported by the record here is the one conceded by the government: an order excluding from evidence the data seized from Lauer's iPhone, and any derivative evidence. I do not recommend that any other sanctions be imposed.

### 3. Recommendations

For the reasons given, I respectfully RECOMMEND the following:

(1) the Defendant's Motion for Return of Property (Computer, BlackBerry, and iPhone Tray) [DE 392], be **DENIED**, and

(2) the Defendant's Motion to Suppress and for Additional Remedy [DE 422], be **GRANTED IN PART**. Specifically, this Court should enter an order barring the government from making use of the information seized from Lauer's iPhone, and any evidence derived from that information, and precluding such information from being introduced into evidence at trial. In all other respects, the Defendant's motion should be

denied.

**4.     Objections**

The parties may file written objections to this Report and Recommendation with the Honorable Adalberto Jordan within **fourteen days** of the date of this Report and Recommendation. Failure to timely file objections shall bar the parties from attacking on appeal any factual findings contained herein. *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988).

RESPECTFULLY RECOMMENDED in chambers at Miami, Florida this 18th day of February, 2010.

CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

cc:   The Honorable Adalberto Jordan
      All counsel of record